1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

| | |
|---|---|
| BIO ENERGY (WASHINGTON), LLC, | CASE NO.  2:23-cv-00542-LK |
| Plaintiff, | ORDER REGARDING CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| KING COUNTY, WASHINGTON, | |
| Defendant. | |

11
12
13
14
15
16
17

    This matter comes before the Court on the parties' cross motions for partial summary judgment. Plaintiff Bio Energy (Washington), LLC ("BEW") and Defendant King County, Washington (the "County") seek summary judgment on certain issues related to their contract under which BEW accepts and processes the County's landfill gas. Specifically, BEW seeks summary judgment declaring that its Plant Condensate, a byproduct of its landfill gas conversion process, is not "solid waste" under the Hazardous Waste Management Act, while the County seeks summary judgment dismissing that claim. BEW also seeks summary judgment on its claim that it, not the County, owns certain environmental compliance credits known as D-3 RINs. And finally, the County requests summary judgment that BEW's declaration of force majeure was invalid.

As set forth below, the Court grants the County's motion regarding Plant Condensate and force majeure, denies BEW's motion regarding Plant Condensate, and denies BEW's motion regarding the D-3 RINs without prejudice.

## I.   BACKGROUND

BEW and the County are parties to an Amended and Restated Project Development and Gas Sales Agreement (the "PDA"). Dkt. No. 39-1. Pursuant to the PDA, BEW owns and operates a landfill gas processing plant (the "Plant") at the Cedar Hills Regional Landfill ("Cedar Hills"), a municipal landfill located in King County, Washington. *Id.* at 13; Dkt. No. 39 at 1–2.

All municipal solid waste generated in King County, with the exception of that generated in Seattle and Milton, is disposed of at Cedar Hills. Dkt. No. 39 at 1. The decomposition of the solid waste at Cedar Hills results in landfill gas. *Id.* Under the PDA, the County sells and delivers landfill gas to BEW, Dkt. No. 39-1 at 21, and BEW processes it to generate alternate gas products or energy to sell to third parties, *id.* at 8.

Until recently, BEW refined the landfill gas into pipeline-quality natural gas, which it sold to Puget Sound Energy ("PSE"). Dkt. No. 38 at 1; Dkt. No. 39 at 2; Dkt. No. 37-1 at 2. Although these arrangements seemed to work well for all three entities for years, disputes have arisen regarding the ownership of certain environmental compliance credits and whether those credits are "Emissions Credits" as defined by the PDA, and whether a byproduct of the refinement process known as Plant Condensate is "solid waste" under the Hazardous Waste Management Act.

### A.   The Relevant Contracts

The County and BEW entered into an Original Project Development Agreement in 2004. Dkt. No. 39-1 at 8. Under that agreement, BEW purchased landfill gas from the County and used it to fuel an electricity generating facility at Cedar Hills. *Id.*

In 2006, the County and BEW's now parent company Ingenco began discussions about amending the agreement into what became the PDA. *Id.* at 8–9; Dkt. No. 37-1 at 3. At least part of the impetus for the amendment was economic and environmental: if BEW could purify the landfill gas into renewable natural gas, the County could stop "flaring" the gas and eliminate the emissions generated from that practice. Dkt. No. 37-1 at 3. In turn, more environmentally friendly practices could result in economic benefits. *Id.* Specifically, the County learned that a program sponsored by the now defunct Chicago Climate Exchange would potentially allow the County to sell "excess" voluntary pollution reductions from Cedar Hills "(over and above any requirements applicable to the County) to third parties that needed additional emission reductions to achieve their own air pollution compliance requirements." *Id.* After Ingenco acquired BEW, BEW and the County reached an agreement on the PDA. *Id.* at 4.

The PDA's definition of "Emissions Credits" would soon become a source of ongoing contention.

1. Early Agreements Relating To "Emissions Credits"

Section 4.13 of the PDA provides that:

The County shall own and specifically retains any and all rights to any Emissions Credits attributable to or generated or otherwise provided in connection with the Plant, the Plant Site, or the generation or sale of Product Gas or otherwise attributable to or generated or otherwise provided in connection with the Landfill or the Landfill Site.

Dkt. No. 39-1 at 19. In turn, schedule 1.1 of the PDA defines "Emissions Credits" as follows:

[A]ll emissions credits, offsets and allowances generated by, and associated with, the generation, collection, distribution, sale or use of fuel or energy, or generated by, and associated with, alternative or renewable energy projects, reforestation projects, or conservation activities. Such emissions credits, offsets and allowances shall include, but are not limited to, those credits and allowances for reductions of sulfur dioxide and other sulfur compounds, acid rain precursors, methane, carbon dioxide, carbon monoxide, chlorinated hydrocarbons and other carbon compounds, nitrogen-oxygen compounds, other greenhouse gases, other ozone precursors, particulate matter, metals and toxic air pollutants.

1    *Id.* at 71.

2        After the King County Council approved the PDA, but before the parties executed the

3    agreement, a dispute arose about the scope of the term "Emissions Credits." Dkt. No. 41 at 9.

4    Specifically, questions arose as to whether the Chicago Climate Exchange "would accept, for

5    trading purposes, emission reductions created by BEW's acceptance of the Cedar Hills landfill gas

6    for purification if the purified gas was subsequently used to produce electricity, electricity that,

7    since it was produced by [renewable natural gas], would potentially qualify for renewable energy

8    certificates" ("RECs"). Dkt. No. 37-1 at 4.[1]

9        Ingenco expressed its position that the RECs were not included within the term "Emissions

10   Credits," but nevertheless, "RECs cannot be utilized by Ingenco or a third party generator to the

11   extent they prevent the County from utilizing any emissions credits." *Id.* at 4, 24. Ingenco proposed

12   an addendum to the PDA reflecting that position. *Id.* at 27–28. The County responded that it had

13   "clear rights to any potential RECs associated with the same gas, as those RECs are wholly

14   dependent upon the emissions credits." *Id.* at 30; *see also id.* at 31 (asserting that "the term

15   Emissions Credit is broadly defined in the Agreement to include the issues in dispute here.").

16   Ultimately, however, the County agreed to modify the PDA to "allow[] Ingenco to sell any RECs

17   that may flow from the project so long as the County's right to the full use of Emissions Credits

18   under the Agreement [wa]s unimpeded." *Id.* at 31. The parties then executed a Memorandum of

19   Understanding ("MOU") that reiterated the County's ownership of Emissions Credits and

20   prohibited Ingenco from selling any instrument, including RECs, that reduced or limited the

21   County's ability to sell or use Emissions Credits. *Id.* at 32–33. The MOU also gave the County the

22

23   ───────────────────

24   [1] The Environmental Protection Agency ("EPA") has defined an REC as "a tradeable, market-based instrument that represents the legal property rights to the 'renewable-ness'—or non-power (i.e. environmental) attributes—of renewable energy generation." *Id.* at 18.

right to "allow Emission Credits to be bundled with Product Gas in connection with the issuance of [RECs]," provided that the parties "shall negotiate a mutually agreeable sharing of benefits received by either party in connection with the issuance of any such [RECs]." *Id.* at 32.

The PDA and MOU were both executed on February 29, 2008. *Id.* at 7.

2.   The Parties Entered into Contracts with PSE

With the PDA and MOU in place, the parties executed separate agreements with PSE. BEW entered into a 2008 Gas Sales Agreement to sell its renewable natural gas to PSE. *Id.* at 8. That agreement stated that BEW was selling "Environmental Attributes" to PSE, which were "any and all RECs, certificates, credits, benefits, emissions reductions, environmental air quality reduction credits, offsets, and allowances . . . but excluding 'Emissions Credits' as may be determined to be owned by King County pursuant to the PDA." *Id.* at 8, 36. BEW conveyed the "Environmental Attributes" to PSE "without additional compensation to BEW" and anticipated that PSE would need to "negotiate and/or obtain" the title to the Emissions Credits from the County. *Id* at 38.

In 2011, the County and PSE entered into an agreement governing the County's sale of Emissions Credits to PSE (the "PSE Agreement"). Dkt. No. 39 at 2. BEW is not a party to the PSE Agreement. *Id.* Pursuant to that agreement, the County sold to PSE all "Product Gas Credits," which included "that portion of the Landfill Emission Credits attributable to or generated or otherwise provided in connection with the Plant, the Plant Site, or the generation or sale of Product Gas[.]" Dkt. No. 37-1 at 54–55.

**B.    A Dispute Arose Regarding the Entitlement to D-3 RINs**

In 2014, discussions began regarding D-3 "Renewable Identification Numbers" ("RINs"), an environmental compliance credit. Dkt. No. 37-1 at 10. The RINs are created when renewable natural gas is sold for a qualifying use—including transportation fuel—under the Environmental

Protection Agency's Renewable Fuel Standard. *Id.* at 4. The legislation that created the RINs established multiple categories; at issue here are D-3 RINs, which became available in 2013. *Id.* at 9 ("The generation of renewable natural gas using municipal landfill gas as feedstock became eligible for the generation of 'D-3' (advanced cellulosic) RINs in 2013."); *see also* 79 Fed. Reg. 42,128, 42,128 (July 18, 2014). The D-3 RINs "are only created and validated if the BEW [renewable natural gas] is compressed and used as transportation fuel," but not if the renewable natural gas is used for other purposes. Dkt. No. 37-1 at 9; *see also id.* at 4; 88 Fed. Reg. 44,468, 44,528 (July 12, 2023).[2] The discovery of the availability of the RINs "created substantial new revenues for PSE from the sale of the BEW [renewable natural gas]." Dkt. No. 37-1 at 10. Once BEW and the County learned about that increased value, they began discussions about how they could share in the bounty. *Id.* at 10, 66.

In July 2014, both BEW and the County reached agreements with PSE to amend their respective contracts with PSE and share in the additional value created by the D-3 RINs. *Id.* at 11. However, in 2019 the County contended to both PSE and BEW that the RINs were included in the PDA definition of "Emissions Credits," and thus were owned by the County. *Id.* at 12. In 2019, the County informed PSE that it intended not to renew the 2011 PSE Agreement upon the expiration of the initial term. Dkt. No. 40-1 at 2–3. Shortly before expiration of the initial term, PSE and the County entered into a six-month agreement for PSE's purchase of Landfill Emission Credits or Product Gas Credits; that agreement expired on June 30, 2023. Dkt. No. 43-2 at 2–13 (the "New PSE Agreement").

---

[2] According to BEW, RECs and RINs are similar in that both types of instruments are created based on the subsequent use of the purified gas, in contrast to credits or offsets which are immediately created when BEW accepts landfill gas from the County for purification into pipeline quality gas. Dkt. No. 37-1 at 4–5; *see id.* at 4 (explaining that RINs, "[l]ike RECs, . . . are only created if the purified [renewable natural gas] is sold for a specific, qualified use under the EPA Renewable Fuel Standard."). BEW notes that "RINs are not the same as RECs, but the two environmental attributes are very similar" in that "[t]hey are both based on the subsequent use of the BEW [renewable natural gas]." Dkt. No. 44 at 8 (emphasis omitted).

When the New PSE Agreement ended, "the BEW/County/PSE relationship was thrown into contractual limbo[.]" Dkt. No. 37-1 at 12. PSE informed BEW that it was no longer able to share the value of the D-3 RINs with BEW and, as a result, would pay a lower price for the renewable natural gas. Dkt. No. 40-3 at 3. The value of the RINs had comprised a significant portion of the revenue BEW derived from the sale of its renewable natural gas to PSE. *Id.*[3] After receiving PSE's notification, BEW felt that it had "no choice but to terminate the [2008] Gas Sales Agreement with PSE." Dkt. No. 40-3 at 3.[4]

## C. BEW Generates Plant Condensate and Discharges It Into the County's Wastewater Facilities

Meanwhile, a second dispute arose over Plant Condensate generated at Cedar Hills. The PDA defines "Condensate" as "water and other liquids derived from the Landfill Gas," Dkt. No. 39-1 at 69, and "Plant Condensate" as "condensate resulting from [BEW]'s processing or flaring Landfill Gas at the Plant after [its] receipt of such Landfill Gas," *id.* at 81.

The landfill gas that the County delivers to BEW "is saturated with water vapor, which condenses and 'drops out' of the gas during BEW's processing operations." Dkt. No. 37-2 at 2. During the refining process, condensate, carbon dioxide, and other substances are removed, yielding renewable natural gas, which is approximately 96% methane. *Id.* The Plant Condensate is essentially a waste product. *See* Dkt. No. 38 at 1–2.

---

[3] BEW states that before the termination of the PSE Agreement, it "was content to share the benefits of the RIN's with both PSE and the County," but now that that agreement has expired, "it can no longer permit the County[] to claim ownership of the RIN's since the value they represent is vital to the continued operation of the BEW Plant." Dkt. No. 37-1 at 13 ("Even though BEW could have claimed 100% of the RIN benefits attached to its [renewable natural gas], it never did so, believing that a sharing of the benefit was equitable and fair.").

[4] The County filed a lawsuit against PSE in June 2020, asserting a claim for breach of contract based on PSE's alleged failure to fairly compensate the County for the sale of RINs; that lawsuit ultimately settled. Dkt. No. 42 at 2 (citing *King Cnty. v. Puget Sound Energy, Inc.*, King County Superior Court Case No. 20-2-09907-4 SEA); *see also* Dkt. No. 43-1 (settlement agreement).

1   As set forth below, the parties dispute whether Plant Condensate is discharged—or

2   effectively discharged—into navigable water of the United States for purposes of the federal Clean

3   Water Act ("CWA"), so the Court recounts the phases of the Plant Condensate's journey.

4   "Condensate drops out of the gas stream at various stages of the Plant's processing operations."

5   Dkt. No. 37-2 at 2. Whenever that occurs, the condensate immediately enters a series of pipes and

6   travels to a sump tank located on the Plant premises. *Id.* Inside the tank is a sump pump that pumps

7   the condensate out of the tank. "This sump pump is automatically activated/deactivated by level

8   floats" that ensure the continuous operation of the pump and conveyance of the condensate. *Id.* at

9   3. The condensate next travels into an oil/water separator on the Plant premises, which is a tank

10  with a capacity of approximately 300 gallons. *Id.* There, oil is removed from the condensate, and

11  the condensate is conveyed by gravity into a pipe and delivered to an underground sump tank

12  known as the "Process Condensate Sump" or "T-1640." *Id.* Inside the T-1640 are two sump pumps

13  that pump the condensate into the condensate discharge pipe. *Id.* From there, the condensate

14  "discharges to an underground pipe," then discharges to a "connected, underground pipe owned

15  by the County." *Id.* at 4.

16   Once the Plant Condensate is delivered to the County, it is combined with County

17  wastewater. *Id.* Eventually, it is discharged into Cedar Hills' leachate lagoons. Dkt. No. 38 at 1–

18  2. Next, Cedar Hills discharges effluent collected in the leachate lagoons to the King County

19  sewerage system. *Id.* at 2; *see also* Dkt. No. 38-1 at 15–16 (describing the process).

20   The contents of the lagoons are periodically discharged via sewerage system facilities to a

21  Publicly Owned Treatment Works ("POTW") facility in Renton, Washington. Dkt. No. 37-2 at 4;

22  Dkt. No. 38 at 3. The Plant Condensate is treated at the South Treatment Plant, a POTW operated

23  by the King County Wastewater Treatment Division. Dkt. No. 38 at 3. Ultimately, the South

24

1    Treatment Plant discharges to waters of the United States as authorized by its National Pollutant

2    Discharge Elimination System ("NPDES") permit. *Id.*

3    **D.      The Applicable Permitting Scheme**

4          Chapter 90.48 of the Revised Code of Washington contains the Washington State Water

5    Pollution Control Act. *See* Wash. Rev. Code § 90.48.010. The Water Pollution Control Act

6    delegates to Washington's Department of Ecology ("Ecology") authority to administer the CWA.

7    *Id.* § 90.48.260(1)(a). The Water Pollution Control Act also authorizes Ecology to delegate to

8    "[a]ny city, town, or municipal corporation operating a sewerage system" the authority to issue

9    permits under the Act for discharges to municipal sewerage systems. *Id.* § 90.48.165. This grant

10   of permitting authority to local municipalities does not abrogate the authority of Ecology to

11   administer the Water Pollution Control Act or the CWA. Wash. Admin. Code § 173-208-070(2)–

12   (3).

13         Cedar Hills has an Industrial Stormwater General Permit issued by Ecology to discharge

14   non-contaminated stormwater to waters of the state. Dkt. No. 38 at 2; Dkt. No. 38-1 at 30–105 (the

15   permit and accompanying cover letter). Although the Industrial Stormwater General Permit is an

16   NPDES permit, it excludes discharges of stormwater run-off from active landfill areas and does

17   not authorize or address discharges of process wastewater to or from the leachate lagoons. Dkt.

18   No. 38 at 2. Cedar Hills does not have an NPDES permit that authorizes the discharge of process

19   wastewater directly to creeks, streams, or other waters of the United States. *Id.*

20         Cedar Hills does have a Water Discharge Permit issued by the King County Industrial

21   Waste Program that allows it to discharge effluent collected in the leachate lagoons to the King

22   County sewerage system. *Id.*; *see also* Dkt. No. 38-2 at 5 (the permit stating that "[p]ermission is

23   hereby granted to discharge industrial wastewater from [Cedar Hills] into the King County

24   Sewerage System in accordance with the effluent limitations and monitoring requirements set forth

in this permit."). The permit is "an industrial wastewater discharge permit in accordance with Chapter 90.48 RCW as Amended, Public Law 92-500 [the CWA], and King County Code (K.C.C.) 28.84.060." Dkt. No. 38-2 at 2. The Waste Discharge Permit does not authorize Cedar Hills to accept "dangerous waste" into its leachate lagoon treatment system, Dkt. No. 38-3 at 2, and the County is required to notify King County Industrial Waste, Ecology, and the EPA "of any discharge of a listed or characteristic [Resource Conservation and Recovery Act] hazardous waste," Dkt. No. 38-2 at 28.

**E.      Concerns Arose that Plant Condensate Was Dangerous Waste**

In April 2022, the County notified BEW of its intent to stop accepting the Plant Condensate. Dkt. No. 39-2 at 2 (referencing the "April 2022 notice"). The County asserted that applicable law precluded it from accepting dangerous waste, and the Plant Condensate fell into that category because it included unacceptably high levels of arsenic. *Id.* at 25; Dkt. No. 38-2 at 51. The County also issued a cease-and-desist letter to BEW prohibiting the introduction of Plant Condensate into the County's leachate lagoons. Dkt. No. 38-2 at 51. However, the County has not enforced that letter because BEW contended that it was not the generator of the arsenic-laden dangerous waste. *Id.*

In May 2022, the County requested assistance from Ecology's Hazardous Waste and Toxics Reduction Program to determine if the Plant Condensate constituted dangerous waste and if so, the identity of the generator of that waste. *Id.* In June 2022, the King County Industrial Solid Waste Program issued a notice of violation to the King County Solid Waste Division for permit violations at Cedar Hills. Dkt. No. 38-3 at 2–6. The notice of violation stated that the acceptance and introduction of the Plant Condensate into Cedar Hills' leachate lagoons violated the permit and section 173-303-141 of the Washington Administrative Code because the Plant Condensate

1    included "levels that are above the federal hazardous waste and state dangerous waste limit of 5.0

2    mg/L for arsenic." *Id.* at 2–3.

3          On May 19, 2023, Ecology issued a preliminary determination that the Plant Condensate

4    designates as "dangerous waste" under the Washington Hazardous Waste Management Act

5    ("HWMA"). Dkt. No. 38 at 2; *see also* Dkt. No. 38-3 at 8 (stating that "it would appear to Ecology

6    that the BEW plant condensate would designate as dangerous waste" due to high levels of arsenic).

7    Ecology also determined that BEW is the generator of the dangerous waste because during its

8    refining process, it removes condensate, creating a solid waste that "designates as dangerous

9    waste." Dkt. No 38-3 at 9. Ecology further stated that it was expressing its "preliminary

10   determinations based on observations made during [its] on-site inspection and information

11   provided by [King County Solid Waste] and BEW" with a formal report and final determinations

12   to follow. *Id.* The parties do not indicate that Ecology has issued a formal report or final

13   determinations. BEW has challenged Ecology's preliminary determination with Ecology and the

14   State Attorney General's Office, and is awaiting a substantive response to its challenge. Dkt. No.

15   22 at 28. Nevertheless, Ecology has informed the County that it "cannot accept off-site

16   hazardous/dangerous waste" and that such waste must be transported to "a permitted [treatment,

17   storage, or disposal] facility." Dkt. No. 25 at 194.

18   **F.    The County Notified BEW that It Could No Longer Accept Plant Condensate**

19         Ecology's preliminary determinations prompted the County to notify BEW of an event of

20   force majeure in May 2023. Dkt. No. 39-2 at 25 (notifying BEW that Ecology's statements "likely

21   constitute an Event of Force Majeure because the County can no longer perform its obligation

22   under Section 4.10.1 of the PDA to 'accept delivery of all quantities of Plant Condensate delivered

23   by [BEW]' to the County and dispose of it in its leachate lagoons 'in accordance with Applicable

24   Law.'"). The County proposed an alternate solution "for BEW to lawfully dispose of the Plant

1    Condensate by having an appropriately permitted entity haul it for disposal at an appropriately

2    permitted facility, and the parties sharing the costs" while this case is resolved. *Id.* at 27. BEW did

3    not accept that overture.

4           The parties disagree regarding whether the County imposed a deadline to stop accepting

5    the Plant Condensate. *Id.* at 8–9 (the County writing that it never "imposed a specific deadline to

6    stop accepting Plant Condensate in response to the County's [force majeure event]"); *id.* at 21

7    (BEW contending that the County threatened that it would stop accepting Plant Condensate in

8    April 2022, then extended the deadline to May 15, 2022). Regardless, despite its notices to BEW,

9    the County continued to accept Plant Condensate until, as set forth below, BEW shuttered the

10   Plant. Dkt. No. 39 at 2.

11   **G.    BEW Declared a Force Majeure Event and Closed the Plant**

12          On June 29, 2023, BEW sent a letter to the County declaring a force majeure event based

13   on the County's April 2022 notice, the County's force majeure notice, and the expiration of the

14   PSE Agreement. Dkt. No. 39-2 at 2–6; Dkt. No. 39 at 2. The letter stated that if the County indeed

15   stopped accepting BEW's Plant Condensate, that fact, combined with the expiration of the PSE

16   Agreement, would "make it virtually impossible for BEW to continue plant operations as they

17   currently are being conducted." Dkt. No. 39-2 at 2-3. BEW opined that the combination of events

18   constituted a "two-pronged effort by the County to make continued operation of the BEW plant

19   uneconomical, in order to force BEW to sell the plant to the County for far less than its fair market

20   value." *Id.* at 3. The letter stated that the County's decision not to renew the PSE Agreement "will

21   prevent PSE from compensating BEW for the [renewable natural gas] on the same basis as in the

22   past." *Id.* The letter thus alleged that a force majeure event had occurred under the PDA. *Id.* at 3–

23   4. It also informed the County that BEW would close the Plant the following day to conduct "some

24

1   long overdue maintenance on the Plant" and thus stop accepting landfill gas from the County. *Id.*

2   at 4.

3            When BEW resumed operations on July 21, 2023, it reduced the amount of landfill gas it

4   would accept from the County. Dkt. No. 40-2 at 66. Ultimately, as of August 11, 2023, BEW had

5   shut down the Plant and ceased accepting the County's landfill gas altogether. Dkt. No. 39 at 2;

6   Dkt. No. 40-2 at 66. The parties subsequently exchanged a series of letters about the issue but have

7   been unable to resolve it. Dkt. No. 39-2 at 8–13 (County's response to the declaration of a force

8   majeure event); *id.* at 15–23; *id.* at 25–30. On November 21, 2023, the County served notice on

9   BEW of its intent to terminate the PDA if BEW did not resume accepting landfill gas by December

10  21, 2023. Dkt. No. 40-2 at 65–67.

11  **H.      BEW Filed Suit and the County Counterclaimed**

12           On April 7, 2023, BEW filed suit in this Court for declaratory judgment and breach of

13  contract, seeking both damages and specific performance as remedies for the alleged breach. Dkt.

14  No. 1 at 28–37. The County filed its answer, Dkt. No. 9, then a timely amended answer with

15  counterclaims, Dkt. No. 12. BEW answered the counterclaims. Dkt. No. 13.

16           A second round of pleadings ensued in August 2023. BEW filed an amended complaint,

17  which is the current operative pleading. Dkt. No. 22. Count I seeks a declaratory judgment on

18  various issues, including, as relevant here, "that the BEW Plant Condensate is not 'solid waste,'

19  based on the exclusions set out in 40 CFR 261.4(a)(2) and WAC 173-303-071(3)(b), and hence

20  can't be classified as 'Dangerous Waste' that is subject to regulation by [Ecology]." *Id.* at 35.

21  Count I also seeks a declaratory judgment that the "RIN's are not included within the definition of

22  'Emission Credits,' as such term is defined in the PDA, and hence are fully owned by BEW." *Id.*

23  Counts II and III allege breach of contract and seek specific performance and damages as remedies.

24  *Id.* at 36–42. Count IV alleges breach of the implied duty of good faith and fair dealing. *Id.* at 42–

44. The County filed an amended answer and asserted eight counterclaims, including, as relevant to this motion, a counterclaim for a declaratory judgment that BEW's notice of Event of Force Majeure is invalid. Dkt. No. 26 at 53–63. BEW then answered the County's counterclaims, Dkt. No. 27, and the parties filed cross motions for partial summary judgment, Dkt. Nos. 36–37.[5]

## II. DISCUSSION

King County requests that the Court (1) dismiss BEW's request for a declaratory judgment that Plant Condensate is not "solid waste" subject to state and federal hazardous waste laws, and (2) grant summary judgment in favor of the County's request for a declaratory judgment that BEW's notice of Event of Force Majeure is invalid. Dkt. No. 36 at 3.

For its part, BEW seeks summary judgment "declaring that the Plant Condensate . . . is not subject to duplicate regulation as a 'solid waste' under the [HWMA] based on the exclusions set out in 40 CFR 261.4(a)(2) and in WAC 173-303-071(3)(b), and hence cannot be classified as 'Dangerous Waste' by the County or the Washington Department of Ecology." Dkt. No. 37 at 2. In addition, BEW seeks summary judgment "declaring that the D-3 RINs are not 'Emissions Credits,' and hence are fully owned by BEW as the producer of the renewable natural gas to which they are attached." *Id.* at 3.

### A. Jurisdiction

Federal jurisdiction exists over civil actions when the matter in controversy exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1). King County is a county "organized and existing under the laws of the State of Washington[.]" Dkt. No. 22 at 1. BEW is an LLC that is wholly owned by Ingenco Holdings, LLC, a Delaware limited liability company. *Id.* at 1–2. The members of Ingenco Holdings, LLC are all individuals who are citizens

---

[5] In addition, the County has filed a motion for judgment on the pleadings on BEW's claim that the County has breached its implied duty of good faith and fair dealing. Dkt. No. 28.

of either Virginia or Texas. *Id.* at 2; Dkt. No. 6 at 1–2; *see Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) (explaining that for diversity purposes, an LLC "is a citizen of every state of which its owners/members are citizens"). The amended complaint also alleges that the amount in controversy exceeds $75,000, which appears true based on the allegations therein. Dkt. No. 22 at 2. Accordingly, the Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

**B.      Summary Judgment Legal Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When parties file simultaneous cross-motions for summary judgment on the same claim, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." (cleaned up)). The Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant has made such a showing, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis, internal quotation marks, and citation omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Kenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## C.   Cross Motions for Summary Judgment Regarding Plant Condensate

The parties dispute whether Plant Condensate is subject to environmental regulation as a "solid waste," or, as BEW contends, it is excluded from that definition. Dkt. No. 37 at 2; Dkt. No. 41 at 3.

### 1.   Legal Standards

The issue about whether Plant Condensate is solid waste involves three environmental laws: (1) the HWMA, (2) the CWA, and (3) the federal Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984 ("RCRA"), 42 U.S.C. § 6901,

the federal hazardous waste statute for which the EPA has delegated enforcement authority to Ecology. Dkt. No. 37 at 8. The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the CWA, an NPDES permit is the "primary means for enforcing" water quality standards. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). The CWA requires "that a person wishing to discharge *any* pollution into navigable waters first obtain EPA's permission to do so." *Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. __, 140 S. Ct. 1462, 1468 (2020). It defines "pollutant" broadly to include solid waste, and defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source[.]" 33 U.S.C. § 1362(6), (12). Navigable waters "means the waters of the United States," *id.* at § 1362(7), which include "navigable streams, rivers, the ocean, or coastal waters from any point source," *Cnty. of Maui*, 140 S. Ct. at 1469 (cleaned up). The CWA's "words reflect Congress' basic aim to provide federal regulation of identifiable sources of pollutants entering navigable waters without undermining the States' longstanding regulatory authority over land and groundwater." *Id.* at 1476.

"RCRA has a different focus than the CWA." *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017). RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). It was enacted to "eliminate[] the last remaining loophole in environmental law"—"that of unregulated land disposal of discarded and hazardous wastes." *Ecological Rts. Found.*, 874 F.3d at 1089 (cleaned up). The definition of "hazardous waste" means "a solid waste, or combination of solid wastes," that may prove dangerous. 42 U.S.C. § 6903(5). "Solid waste," in turn, "means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including

solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities[.]" *Id.* § 6903(27).

At issue here is the following exclusion from RCRA's definition of solid waste: "Industrial wastewater discharges that are point-source discharges subject to regulation under section 402 of the [CWA]." 40 C.F.R. § 261.4(a)(2).[6] The HWMA contains the same exclusion. Wash. Admin. Code § 173-303-071(1) ("Certain categories of waste have been excluded from many of the requirements of chapter 173-303 WAC because they . . . are regulated under other state and federal programs[.]"); *id.* § 173-303-071(3)(b) (exclusion); *see also* Dkt. No. 37-3 at 35–36 (EPA Interpretation Memorandum explaining that the purpose of the exclusion is to avoid duplicate regulation under both the CWA and RCRA).[7]

2. The Court Declines BEW's Surreply Request to Strike

BEW asks the Court to strike "those portions of the County's Reply that seek to assert that the discharges of BEW's Plant Condensate are not the functional equivalent of a direct discharge to navigable waters, including, without limitation, Section II(A)(1) of its Reply." Dkt. No. 47 at 3. It argues that the County's motion on that issue was limited to arguing that "wastewater must be discharged *directly* to navigable waters (waters of the United States), . . . and (b) BEW does not discharge Plant Condensate directly to waters of the United States." *Id.* at 2 (citing Dkt. No. 36 at 15). But the County was entitled to respond to BEW's arguments in its opposition brief that the

---

[6] The CWA and Washington's NPDES permit program contain the same definition of "point source": "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); Wash. Admin. Code § 173-220-030(18).

[7] Both RCRA and the HWMA contain an exception to the exclusion: "This exclusion does not apply to the collection, storage, or treatment of industrial waste-waters prior to discharge, nor to sludges that are generated during industrial wastewater treatment." Wash. Admin. Code § 173-303-071(3)(b); 40 C.F.R. § 261.4(a)(2). BEW argues that the exception to the exclusion is inapplicable. Dkt. No. 37 at 11. The Court does not address that argument—or the County's response—because the exclusion itself is inapplicable as set forth below.

Plant Condensate was functionally discharged into navigable waters. Dkt. No. 40 at 2–7; *see also Koerner v. Grigas*, 328 F.3d 1039, 1048–49 (9th Cir. 2003) (although appellate court will not normally consider matters not specifically argued in the opening brief, an exception exists when the issue is raised in the appellee's brief); *Sanchez v. Cnty. of San Bernardino*, No. CV10-09384MMM(OPx), 2014 WL 12734756, at *4 (C.D. Cal. Mar. 10, 2014) ("The court can properly consider evidence and argument offered in reply that is responsive to points raised in the non-moving party's opposition[.]"). In addition, the Court allowed BEW to file a supplemental reply to address what BEW characterized as the County's new argument, and BEW did so. Dkt. Nos. 48–49; *see also Harris v. City of Kent*, No. 2:20-CV-01045-RSM-TLF, 2022 WL 1310080, at *5 (W.D. Wash. Mar. 11, 2022) ("When new evidence is presented in a reply brief, the court should not consider the new evidence without giving the non-movant a chance to respond."). Therefore, the Court declines BEW's request to strike.

3.   The Exclusion Is Inapplicable

The parties hotly dispute the applicability of RCRA/HWMA's exclusion from the definition of solid waste. Dkt. No. 36 at 12–17; Dkt. No. 37 at 8–16; Dkt. No. 41 at 11–19; Dkt. No. 43 at 3–10; Dkt. No. 44 at 2–6; Dkt. No. 45 at 4–9.

*(a) BEW and Cedar Hills Are Not Regulated Under a Section 402 Permit*

BEW acknowledges that it does not hold a section 402 permit. Dkt. No. 43 at 8. Still, it contends that the exclusion applies and that Plant Condensate "does not qualify as 'solid waste' (and hence cannot be designated as a 'dangerous waste') since it is . . . regulated as a point source, industrial wastewater discharge under the County's NPDES permit issued pursuant to Section 402 of the Clean Water Act[.]" Dkt. No. 37 at 9; *see also* Dkt. No. 43 at 8.

The County argues that its Waste Discharge Permit, which allows Cedar Hills to discharge to the South Treatment Plant, was not issued by King County Industrial Waste under section 402

of the CWA; it was issued under section 307(b) of the CWA, which is the pretreatment program. Dkt. No. 36 at 15–16; Dkt. No. 41 at 13–14; *see also* Dkt. No. 38 at 2; Dkt. No. 37-2 at 6, 9 (Waste Discharge Permit granting permission under King County Code ("K.C.C.") § 28.84.060 and other authorities "to discharge industrial wastewater from [Cedar Hills] into the King County Sewerage system"); K.C.C. § 28.84.060 (regulations "for the disposal of industrial waste into the metropolitan sewerage system").

Under the CWA, the EPA regulates three categories of discharges: "(1) point sources discharging directly into navigable waters ('direct dischargers');" (2) POTWs "treating and discharging municipal sewage or industrial wastewater;" and (3) "point sources discharging pollutants into POTWs rather than directly into navigable waters ('indirect dischargers')." *Waste Action Project v. Draper Valley Holdings LLC*, 49 F. Supp. 3d 799, 801 (W.D. Wash. 2014). Under section 307, "[f]acilities that discharge to POTWs are excluded from NPDES permitting requirements but are subject to national general pretreatment standards (40 CFR Part 403), applicable categorical pretreatment standards (specified in 40 CFR Parts 405-471), and any State or local pretreatment standards." United States Env't Prot. Agency, *Clean Water Act (CWA) and Fed. Facilities* (Dec. 14, 2023), https://www.epa.gov/enforcement/clean-water-act-cwa-and-federal-facilities (last visited Feb. 7, 2024). In contrast, "[p]oint source discharges of pollutants to waters of the United States" must comply with certain provisions of the CWA, and "[t]he most common way to achieve such compliance is to obtain authorization to discharge pursuant to an NPDES permit issued by EPA or a State agency that has an approved NPDES program." *Id.*

The County's permit is subject to pretreatment standards consistent with its status as a facility that discharges to a POTW. *See generally* Dkt. No. 37-2; *see also id.* at 6, 9; K.C.C. § 28.84.060. Thus, neither BEW's discharge of the Plant Condensate to the County's leachate

lagoons nor the County's discharge to the POTW/South Treatment Plant is currently regulated under a section 402 permit. Nor should they be.

### (b) BEW's Discharge is Not the Functional Equivalent of a Direct Discharge to Navigable Waters

BEW contends that even if no section 402 permit applies to its discharge of Plant Condensate, the exclusion to the definition of solid waste still applies when point sources are "subject to" such permits, Dkt. No. 44 at 4 (emphasis omitted), meaning that such point sources "should have a NPDES permit in place, whether in fact they do or not," Dkt. No. 37-3 at 35. If a discharge is "subject to" an NPDES permit, whether the facility has such a permit or not, the discharge is excluded from the RCRA definition of solid waste. *San Diego Coastkeeper v. Pick-Your-Part Auto Wrecking*, No. 22-CV-1693-TWR (DDL), 2023 WL 4879832, *15 (S.D. Cal. July 31, 2023). A party is "subject to" regulation under section 402 of the CWA—and thus not subject to regulation under RCRA—if it "(1) discharged, i.e., added (2) a pollutant (3) *to navigable waters* (4) from (5) a point source[.]" *Id.* (quoting *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)).

BEW argues that its "Plant Condensate-handling facilities and operations constitute a 'point source'" because they constitute discernable conveyances from which pollutants may be discharged, including containers, pipes, and conduits. Dkt. No. 43 at 6 (citing *Cnty. of Maui*, 140 S. Ct. at 1469). Even if BEW were discharging Plant Condensate from a point source, it must still establish the second part of the equation: that it is discharging "to navigable waters." 33 U.S.C. § 1362(12). BEW does not argue that the leachate lagoons are navigable waters.

Instead, BEW argues that because the Plant Condensate eventually makes it way to Puget Sound, BEW's operations are subject to a CWA permit. Dkt. No. 43 at 6–7; Dkt. No. 44 at 5. It notes that in *County of Maui*, the Supreme Court held that the CWA "requires a permit when there

is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*." Dkt No. 43 at 4 (quoting *County of Maui*, 140 S. Ct. at 1476 (explaining that a permit is required when there is a direct discharge to navigable waters and "when the discharge reaches the same result through roughly similar means.")).

The *County of Maui* Court further explained that "[v]irtually all water, polluted or not, eventually makes its way to navigable water," making it challenging to determine when it is from a point source and to navigable waters. *Id.* at 1470. To that end, it identified certain factors to consider, including time and distance. *Id.* at 1476 ("Where a pipe ends a few feet from navigable waters and the pipe emits pollutants that travel those few feet through groundwater (or over the beach), the permitting requirement clearly applies," but "[i]f the pipe ends 50 miles from navigable waters and the pipe emits pollutants that travel with groundwater, mix with much other material, and end up in navigable waters only many years later, the permitting requirements likely do not apply."). The Court also listed other factors "that may prove relevant (depending upon the circumstances of a particular case)." *Id.* These include the following:

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, [and] (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id.* at 1476–77.

BEW's assertion that discharge of Plant Condensate is subject to the CWA does not consider the factors in *County of Maui*. The Plant Condensate goes through a complicated process before reaching Puget Sound. First, BEW discharges Plant Condensate into the County's leachate lagoons. Dkt. No. 38 at 2. Next, Cedar Hills commingles BEW's discharges of Plant Condensate with its process wastewater, and then discharges it to the King County sewerage system pursuant

to a pretreatment permit. Dkt. No. 37-2 at 4; Dkt. No. 41 at 16; Dkt. 38-2 (the Waste Discharge Permit). At no point during that process does the Plant Condensate travel through a nonpoint source—like the groundwater in *County of Maui*—to navigable waters, which distinguishes this case from some of the cases on which BEW relies. Dkt. No. 45 at 6; *Cnty. of Maui*, 140 S. Ct. at 1468; *see also Coldani v. Hamm*, No. Civ. S-07-660-RRB-EFB, 2007 WL 2345016, at *9–10 (E.D. Cal. Aug. 16, 2007) (holding that the alleged polluter was subject to an NPDES permit under the CWA because it discharged animal waste into groundwater that migrated into navigable waters); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1319–20, 1328–29 (S.D. Iowa 1997) (holding that the CWA applied to spills and leaks of pollution that entered navigable water through groundwater). Cedar Hills' discharge then travels to the South Treatment Plant, where it undergoes "final treatment" before ultimately discharging to waters of the United States as authorized by the South Treatment Plant's own NPDES permit. Dkt. No. 37-2 at 4; Dkt. 38 at 3. By that time, the Plant Condensate has been combined with other wastewater, diluted, and treated. *Cnty. of Maui*, 140 S. Ct. at 1476–77; Dkt. No. 43 at 7 (BEW acknowledging that by the time Plant Condensate reaches Puget Sound, it "will have been diluted, of course, but it is 'from' BEW"). Thus, even if the Plant Condensate is discharged from a point source, its discharge into the County's pipes and leachate lagoons is not the functional equivalent of a direct discharge into navigable waters.

Also of importance here, the Supreme Court in *County of Maui* noted that "[t]he object in a given scenario will be to advance, in a manner consistent with the statute's language, the statutory purposes that Congress sought to achieve." 140 S. Ct. at 1476. BEW's interpretation would defeat those purposes and limit the state's ability to regulate its discharges. In the same vein, BEW's argument that its Plant Condensate "is already regulated/subject to regulation fully (and adequately) under the County's Wastewater and NPDES Permits," Dkt. No. 49 at 3, would allow

BEW's operations to escape regulation simply because the downstream processor—King County—is regulated. Thus, the cases on which BEW relies, which sought to expand rather than constrict the scope of environmental protection, are inapposite. *United States v. Velsicol Chem. Corp.*, 438 F. Supp. 945, 947 (W.D. Tenn. 1976) (noting that defendant discharged into navigable waters when it discharged into the city's wastewater collection system and that system emptied into the Mississippi River without treatment).[8]

Finally, BEW contends that sources, like BEW, that indirectly discharge into treatment plants "are still deemed to discharge into waters of the United States based on the principle of 'pass through,' which is explicitly recognized in the federal regulations." Dkt. No. 43 at 9–10. However, the regulations BEW cites do not suggest that all discharges that travel through a POTW are subject to Section 402. Instead, the regulations establish the responsibility of government entities "to control pollutants which pass through or interfere with treatment processes," 40 C.F.R. § 403.1(a), and define "Pass Through" as "a Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation)," *id.* § 403.3(p). Those regulations implement section 307, 33 U.S.C. § 1317(b)(1), which establishes the pretreatment program: "Pretreatment standards under this subsection . . . shall be established to prevent the discharge of any pollutant through treatment works . . . which pollutant interferes with, passes through, or otherwise is incompatible with such works." *See also Cerro Copper Prods. Co. v.*

---

[8] Other cases BEW cites do not help its position because in those cases, unlike here, the alleged polluter held a section 402 permit for the discharges at issue. *See, e.g., Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co.*, 91 F. Supp. 3d 940 (S.D. Ohio 2015). BEW argues that *Patronas v. Marshall Durbin Food Corporation*, No. CV-03-J-749-J, 2005 WL 8158435, *9 (N.D. Ala. Mar. 17, 2005) supports its position because it held that "a discharge to a publicly owned treatment plant in violation of a NPDES permit limit is the same as a discharge in violation of that permit directly to a waterway." But here, there is no allegation that an entity is discharging to a POTW in violation of an NPDES permit.

1   *Ruckelshaus*, 766 F.2d 1060, 1061 (7th Cir. 1985) (noting that the CWA "provides that indirect

2   dischargers—those whose wastewater passes through a [POTW]—pretreat their wastewater

3   discharge before passing it along to the POTW for further treatment"). The fact that the County

4   and POTW are regulated does not mean that BEW's Plant Condensate is a direct discharge into

5   navigable waters or the functional equivalent thereof. And BEW presents no evidence that Plant

6   Condensate is exiting the POTW into Puget Sound in quantities or concentrations that violate the

7   POTW's NPDES permit. 40 C.F.R. § 403.3(p). Thus, the pass through concept is not relevant here.

8        Based on the foregoing, the Court denies BEW's motion for summary judgment that its

9   Plant Condensate is excluded from the definition of "solid waste" under RCRA and HWMA, and

10  grants the County's motion on this issue.

11  **D.    BEW's Claim for Declaratory Judgment Regarding Emissions Credits**

12       BEW seeks summary judgment on its claim for a declaratory judgment "that the D-3 RINs

13  are not 'Emissions Credits,' and hence are fully owned by BEW as the producer of the renewable

14  natural gas to which they are attached." Dkt. No. 37 at 3. BEW contends that the County "is trying

15  to modify and expand the definition of 'Emissions Credits' in the PDA" to include the RINs even

16  though "RINs are not even mentioned in the definition of 'Emissions Credits' or anywhere else in

17  the PDA." *Id.* BEW also argues that the RINs are fundamentally different from—and not included

18  in the PDA definition of—Emissions Credits. Dkt. No. 37-1 at 4–5.

19       The County urges the Court to deny BEW's motion regarding the Emissions Credits based

20  on Rule 56(d). Dkt. No. 41 at 19–22. Alternatively, it asks the Court to deny the motion on the

21  merits. *Id.* at 22–26.

22       1.   Federal Rule of Civil Procedure 56(d) Standard

23       If the nonmoving party "shows by affidavit or declaration that, for specified reasons, it

24  cannot present facts essential to justify its opposition, the court may: (1) defer considering the

motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Rule 56(d) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002). "To prevail under this Rule, parties opposing a motion for summary judgment must make '(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists.'" *Emps Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (9th Cir. 2004) (quoting *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986)). A Rule 56(d) "continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of the Fort Peck Rsrv.*, 323 F.3d 767, 773–74 (9th Cir. 2003) (quoting *Wichita Falls Off. Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 n.4 (5th Cir. 1992)); *see also Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (explaining that although the rule "facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'") (quoting *Anderson*, 477 U.S. at 250 n.5)).

2. The County Has Identified the Information it Hopes to Gain and its Relevance

Although BEW contends that the declaration the County filed in support of its Rule 56(d) request is insufficient, Dkt. No. 44 at 8, that declaration specifically identifies the information the County hopes to gain and its relevance: "The additional discovery needed includes but is not limited to (1) further documents regarding the parties' contract negotiations, discussions of RINs

and the meaning of Emissions Credits, (2) the parties' course of dealing with Puget Sound Energy, and (3) depositions of relevant witnesses on these and other topics." Dkt. No. 42 at 2. The County also avers that BEW has not produced the amendment to its 2008 Gas Sales Agreement with PSE despite discussing it in its motion, so the County cannot yet assess BEW's characterization of its terms. *Id.*[9] Nor has BEW produced documents relating to its negotiations with PSE regarding RINs or all of the documents that evidence communications between the County and BEW regarding their understanding of whether Emissions Credits includes RINs. Dkt. No. 42 at 2. Both parties recite their contract negotiations in support of their positions about the ownership of the RINs. Dkt. No. 37 at 20–24; Dkt. No. 41 at 9–10. The County's declaration also alleges a significant imbalance in information exchanged to date. BEW has received "over one million pages of documents produced by the County through pre-litigation Public Records Act requests" and "BEW has made only a single production of 121 documents, which it produced on the same day that it filed its Motion for Partial Summary Judgment." Dkt. No. 42 at 2.

Of course, none of this discovery is necessary if the contract language is clear.

### 3. The Contract Language is Ambiguous

Washington follows the "objective manifestation theory" of contract interpretation, focusing "on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). Washington courts thus "impute an intention corresponding to the reasonable meaning of the words used" based on the words' "ordinary, usual, and popular meaning" unless "the entirety of the agreement clearly demonstrates a contrary intent." *Id.* Accordingly, "the

---

[9] BEW counters that it filed the amendment to the 2008 Gas Sales Agreement on December 4, 2023 with its response to the County's motion for partial summary judgment. Dkt. No. 44 at 9. That document was filed after the County filed its declaration and response to BEW's motion. Dkt. Nos. 41–42, 43-1. The County thus did not have that amendment in time to respond to BEW's motion.

1   subjective intent of the parties is generally irrelevant if the intent can be determined from the actual

2   words used." *Id.* If relevant for determining mutual intent, Washington courts allow extrinsic

3   evidence "'to determine the meaning of *specific words and terms used*' and not to 'show an

4   intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *Id.*

5   (emphasis added in *Hearst*) (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 842 (Wash. 1999)).[10]

6   Indeed, the Court "will not read ambiguity into a contract where it can reasonably be avoided."

7   *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014) (cleaned up).

8        The PDA provides that "[t]he County shall own and specifically retains any and all rights

9   to any Emissions Credits"—that is, "all emissions credits, offsets and allowances generated by,

10   and associated with, the . . . sale or use of fuel or energy, or . . . alternative or renewable energy

11   projects"—that are "attributable to or generated or otherwise provided in connection with . . . the

12   generation or sale of Product Gas." Dkt. No. 39-1 at 19, 71.[11] Despite this capacious language, the

13   MOU suggests that BEW's "creat[ion], use, s[ale] or retire[ment]" of "any instrument, including

14   any renewable energy certificate" is not necessarily inconsistent with the County's exclusive rights

15   to Emissions Credits. Dkt. No. 37-1 at 32.[12] Specifically, the MOU allows such creation, use, sale,

16   or retirement, so long as it does not "reduce[] or limit" the County's rights to Emissions Credits,

17   and provided that this does not limit BEW "from producing and selling Product Gas." *Id.* Since

18

---

19   [10] Extrinsic evidence includes the subject matter and objective of the contract, all the circumstances surrounding the
20   making of the contract, the subsequent acts and conduct of the parties, and the reasonableness of the respective
interpretations urged by the parties. *Berg v. Hudesman*, 801 P.2d 222, 229 (Wash. 1990).

21   [11] "Product Gas" is the "gas produced by the Plant that is pipeline quality and suitable for injection into the interstate
natural gas pipeline[.]" *Id.* at 81.

22   [12] The parties indicated that they intended the 2008 MOU to amend the terms of the PDA by stating in the MOU that
"notwithstanding Section 20.3 of the [PDA,] the terms of the [PDA] shall be subject to, and interpreted in accordance
with," the MOU. Dkt. No. 37-1 at 32; *see also* Dkt. No. 39-1 at 61 (PDA Section 20.3 providing that the "Agreement,
23   the Plant Site Lease, and the Landfill Gas Project Agreement dated July 12, 2006, contain and integrate the complete
agreement between the Parties," and Section 20.1 providing that the PDA cannot "be amended, changed or modified
except by a subsequent agreement in writing which indicates that such writing is intended to amend the terms of this
24   Agreement and is signed by duly authorized officers of both Parties").

the County has exclusive rights to Emissions Credits, and the parties did not find it necessary to, for example, provide a limited license or assignment of such rights to BEW for use in transactions relating to renewable energy certificates, it appears that such certificates and other instruments are excluded from the definition of Emissions Credits and from the County's rights under Section 4.13 of the PDA.

The scope of Emissions Credits is further muddied in the next section of the MOU. That section permits the County in its "sole discretion" to "allow Emission[s] Credits to be bundled with Product Gas in connection with the issuance of renewable energy credits," in which case the parties "shall negotiate a mutually agreeable sharing of benefits received by either party in connection with the issuance of any such renewable energy credits." Dkt. No. 37-1 at 32. Because the prior section of the MOU fully reserves BEW's rights to produce and sell Product Gas and seems to excise renewable energy credits from the definition of Emissions Credits, it is unclear what relationship such Credits have with issuance of renewable energy credits when bundled with Product Gas.

Because the scope of Emissions Credits is unclear, the Court cannot discern from the contract language alone whether the term encompasses RINs, or whether RINs are instead instruments akin to renewable energy credits that are potentially segregable from Emissions Credits under the MOU.[13] Thus, extrinsic evidence is necessary to determine the parties' intent,

---

[13] BEW argues that emissions credits or offsets "are created by the elimination of certain greenhouse gases and other pollutants from a source of such emissions, such as the Cedar Hills Landfill," Dkt. No. 37 at 21; *see also id.* at 25–26, but offers no support for its proposed "ordinary meaning" interpretation of these contract terms other than extrinsic evidence. Nor does BEW explain how the supposedly later creation of RINs means that they are not "generated by, and associated with, the . . . sale or use of fuel or energy, or . . . alternative or renewable energy projects" or "attributable to or generated or otherwise provided in connection with . . . the generation or sale of Product Gas." Dkt. No. 39-1 at 19, 71; *see also Overview for Renewable Fuel Standard: Program Compliance Basics,* EPA (Jan. 23, 2024), https://www.epa.gov/renewable-fuel-standard-program/overview-renewable-fuel-standard#compliance (last visited Feb. 8, 2024) ("RINs are generated when a producer makes a gallon of renewable fuel."); Dkt. No. 22 at 29 ("An individual RIN is created for each equivalent gallon of ethanol contained in the BEW RNG.").

and the Court addresses whether the County has met the remaining requirement of Rule 56(d). *Hearst Commc'ns, Inc.*, 115 P.3d at 267.

### 4.   The County Has Satisfied the Remaining Requirement of Rule 56(d)

The County filed its Rule 56(d) request early in the case, nearly a year before the December 2, 2024 trial date and seven months before the July 5, 2024 discovery deadline. Dkt. No. 16 at 1–2 (case schedule); Dkt. No. 41 (the County's December 4, 2023 request). Its request is therefore timely. *See IVC Highlands TT, LLC v. DirectBuy, Inc.*, No. C16-327-RAJ, 2016 WL 3690127, at *2 (W.D. Wash. July 12, 2016) (finding that a Rule 56(d) request was timely when it was "filed within the time Defendant had to oppose the summary judgment motion").

Where, as here, "a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56[d] motion fairly freely." *Burlington N. Santa Fe R.R.*, 323 F.3d at 773 (citing the prior version of Rule 56(d)). Accordingly, the County is entitled to relief under Rule 56(d) and BEW's motion for summary judgment on the issue of the Emissions Credits is denied without prejudice to filing a renewed motion after discovery.

Finally, an additional issue further highlights that BEW is not entitled to summary judgment on this issue based on the current record: PSE is not a party to this action, and the parties have not addressed whether it is a required party under Federal Rule of Civil Procedure 19. BEW seeks a declaration that the RINs "are fully owned by BEW as the producer of the renewable natural gas to which they are attached." Dkt. No. 37 at 3; *see also* Dkt. No. 22 at 35 (alleging that the RINs "are not included within the definition of 'Emission Credits,' as such term is defined in the PDA, and hence are fully owned by BEW."). A ruling in BEW's favor that the RINs are not— and thus never were—included in the PDA definition of Emissions Credits could impact whether the County could have conveyed the RINs through the PSE Agreement, the New PSE Agreement,

and/or the settlement agreement. Therefore, a ruling that the Emissions Credits did not include the RINs could "impair or impede [PSE]'s ability to protect" the revenue it generated from exercising the RINs, and/or leave the County subject to the risk of inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(B)(i). If either party files a dispositive motion related to the ownership of the RINs, both parties must address this issue in their briefing.

**E.     The County's Claim for Declaratory Judgment Regarding Force Majeure**

The County seeks summary judgment on its claim for a declaratory judgment "that BEW's declaration of an Event of Force Majeure pursuant to Section 12.1 of the [PDA] is invalid." Dkt. No. 36 at 4.

BEW contends that a force majeure event occurred because the County allowed the PSE Agreement to expire, which caused PSE to reduce the amount it is willing to pay for BEW's renewable natural gas. Dkt. No. 40 at 20 ("BEW was forced to declare force majeure . . . since it could no longer afford to sell its [renewable natural gas] to PSE based on PSE's new terms."). The County argues that this rationale is purely economic and is therefore excluded under the PDA's definition of a force majeure event, which states that "lack of money, financial inability to perform or changes in a Party's costs of performing its obligations hereunder shall not constitute an Event of Force Majeure." Dkt. No. 36 at 4 (quoting Dkt. No. 39-1 at 74) (emphasis omitted). The County also argues that the PDA excuses performance only if a party is "prevented, hindered or delayed from performing" any of its obligations under the PDA, which BEW was not. *Id.* at 17–18 (quoting Dkt. No. 39-1 at 35).

BEW counters that the termination of the PSE agreement has significantly hurt its revenues. It explains that under the 2008 Gas Sales Agreement, PSE compensated it for the renewable natural gas through a formula that included a share of the value of the RINs. Dkt. No. 40-3 at 3. BEW further avers that the County's termination of the PSE Agreement "has reduced

BEW's revenues from the sale of its renewable natural gas by approximately 90%, and made it economically impossible for BEW to continue operating the Plant. In a word, the County's actions have amounted to economic sabotage of BEW's operations." Dkt. No. 43 at 3. BEW avers that it is financially able to perform, and its costs of operating the plant have not "materially changed." Dkt. No. 40-1 at 6. "The only thing that has changed is the Plant's operating revenues" due to the County's termination of the PSE Agreement. *Id.* at 6–7; *see also* Dkt. No. 40-3 at 2–3 (explaining that BEW's costs have not materially changed but if it is forced to restart the plant, "it will sustain substantial operating losses" and loss of revenue from the RINs).[14]

Subject to certain requirements, "[i]f a Party is prevented, hindered or delayed from performing any of its obligations under [the PDA] . . . including a Party's ability to accept or deliver Landfill Gas because of an interruption of its operations[] by an Event of Force Majeure," then the "Affected Party shall be excused from performance of such obligations to the extent it is so prevented, hindered or delayed[.]" Dkt. No. 39-1 at 35. The PDA defines an "Event of Force Majeure" as:

> [A]ny event or circumstance (or combination thereof) and the continuing effects of any such event or circumstance (whether or not such event or circumstance was foreseeable or foreseen on the PDA Effective Date) which is (a) not attributable to the act, neglect, omission, breach of contract or of statutory duty, gross negligence or willful misconduct of the Affected Party, its Representatives or its Subcontractors and (b) which could not have been prevented, overcome or remedied by the Affected Party through its exercise of reasonable diligence under the circumstances.

*Id.* at 73. Events of Force Majeure include—among other listed examples—acts of God, storms, war, sabotage, epidemics, changes in law, breakdowns in machinery, and worker strikes. *Id.* The

---

[14] BEW also contends that (1) the PSE Agreement did not simply expire; it would have continued if the County had not issued an early termination notice to PSE, and (2) the County did not fully answer discovery requests about any economic benefit it derived from ending the PSE Agreement and "misrepresented" that the PSE Agreement expired on its own terms. Dkt. No. 43 at 3, 13–14. However, BEW does not argue or show that those issues are relevant to whether it was prevented from performing its contractual obligations due to a force majeure event. These issues thus present no genuine issue of material fact.

PDA further states that "lack of money, financial inability to perform or changes in a Party's costs of performing its obligations hereunder shall not constitute an Event of Force Majeure." *Id.* at 74.

Although BEW tries to couch its assertions in terms of diminished revenue rather than financial ability, BEW's arguments allege, at their core, that the company *cannot afford* to operate the Plant due to the drop in revenue. Dkt. No. 37-1 at 13 (BEW "can't afford to operate the Plant in the face of an 80% drop in revenues"); *see also* Dkt. No. 43 at 15 (BEW arguing that "no business can continue to operate indefinitely at a loss."); Dkt. No. 40-3 at 4 (BEW's "eventual shutdown would be solely due to loss of revenues, not increased costs, or any lack of BEW's ability to perform."). There is no practical distinction between a financial inability to perform and a financial inability to *afford* to perform. BEW's argument that is it financially unable to operate the Plant is a circumstance that is excluded from the definition of a force majeure event for "financial inability to perform." Dkt. No. 39-1 at 74.

More importantly, though, BEW fails to establish the threshold requirement that it be "prevented, hindered or delayed from performing any of its obligations under [the PDA.]" *Id.* at 35. BEW's notice of force majeure does not state that it is prevented, hindered, or delayed in performing. Instead, the notice states that operating the plant will be less profitable. Dkt. No. 39-2 at 3 (stating that it was invoking force majeure because the termination of the PSE Agreement "will prevent PSE from compensating BEW for the renewable natural gas on the same basis as in the past"). As the County notes, BEW admits that it is able to continue performing its obligations under the PDA. BEW's Chief Executive Officer unequivocally states that BEW has the capability to restart the Plant, that "there is no question that BEW has the financial ability to perform," and that "[t]he only thing that has changed is the Plant's operating revenues." Dkt. No. 40-1 at 6. And BEW's Chief Financial Officer states that BEW "would be able to continue operations for several years without revenue from landfill gas purification." Dkt. No. 40-3 at 3 ("BEW can afford to

1   resume and continue plant operations," although "it will sustain substantial operating losses due

2   to the sharp reduction in revenues from the sale of its renewable natural gas to [PSE.]"). Although

3   BEW argues that events "have now combined to prevent BEW from taking the County's landfill

4   gas, and turning it into [renewable natural gas]," Dkt. No. 43 at 21, it has not shown that anything

5   prevents it from performing its obligations under the PDA.

6         BEW argues that PSE might not allow it to transmit the renewable natural gas via its

7   "Transfer Line," Dkt. No. 43 at 20–21, which is the approximately one-quarter-mile-long pipeline

8   that connects the Plant to the Northwest Pipeline, Dkt. No. 40-1 at 7. Speculation about what PSE

9   might or might not do—if and when BEW reopens the Plant—does not demonstrate that BEW is

10  currently unable to perform. Dkt. No. 39-1 at 35.

11        Nor does BEW argue that any inability to use the Transfer Line prevents it from performing

12  under the PDA. Whether and how BEW can transmit renewable natural gas to PSE or another

13  customer has no direct bearing on whether it can accept the County's landfill gas, operate the Plant,

14  and otherwise perform under the PDA. This is underscored by the fact that BEW is apparently able

15  to process the landfill gas at the Plant into something other than renewable natural gas. Dkt. No.

16  39-2 at 20–21 (BEW noting in a letter to the County that "one of the options BEW is considering

17  is using landfill gas collected by the County to produce electricity, rather than renewable natural

18  gas."); *see also* Dkt. No. 39-1 at 8–9, 12–13 (PDA recitals and obligations); *id.* at 26–27 (providing

19  that BEW may sell "Product Gas, electricity, or other energy generated by the Plant"). In the same

20  vein, BEW's argument that it can "no longer afford to sell its [renewable natural gas] to PSE" does

21  not show that it is prevented, hindered, or delayed from performing its separate obligations under

22  the PDA. Dkt. No. 43 at 20.

23        Moreover, it was BEW's decision to terminate the 2008 Gas Sales Agreement with PSE to

24  try to find a new buyer who "will pay the full market value of the [renewable natural gas], including

ORDER REGARDING CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT - 34

the value of any D-3 RIN's that may be created based on the ultimate use of the [renewable natural gas]." Dkt. No. 40-1 at 8. An Event of Force Majeure cannot be based on a party's own actions, such as BEW's decision to terminate that agreement. Dkt. No. 39-1 at 73 (defining an Event of Force Majeure to include an event that is "not attributable to the act . . . of the Affected Party").[15] Thus, BEW cannot establish a force majeure event based on its own decision to terminate the 2008 Gas Sales Agreement with PSE.

Accordingly, the County is entitled to summary judgment on this claim.

### III.   CONCLUSION

For the foregoing reasons, the Court GRANTS the County's motion for partial summary judgment, Dkt. No. 36, and DENIES BEW's motion for partial summary judgment, Dkt. No. 37.

Because this Order could affect the parties' arguments regarding the County's pending motion for judgment on the pleadings on BEW's claim for breach of the implied duty of good faith and fair dealing, Dkt. No. 28, the parties are ORDERED to meet and confer again regarding that motion and file a joint status report within 14 days of the date of this order stating whether the motion can be withdrawn or whether either party requests supplemental briefing on that motion. In the event of the latter, the parties shall submit a proposed briefing schedule.


Dated this 9th day of February, 2024.


Lauren King
United States District Judge

---

[15] BEW also acknowledges that the renewable natural gas could be sold for other purposes, although those other uses might not generate RINs. Dkt. No. 37-1 at 9.